JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
MISTY L. DANTE
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Misty.Dante@usdoj.gov
Attorneys for the United States

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

$163,500 in United States Currency,

      Defendant.

3:23-CV

**Complaint for Forfeiture in Rem**

The United States of America, in a civil cause for forfeiture, respectfully states as follows:

**SUBJECT MATTER JURISDICTION**

1. This Court has jurisdiction under 19 U.S.C. §§ 1603, 1608, and 1610; Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Fed. R. Civ. P. Supp. Rule) C, E, and G; 21 U.S.C. § 881(a)(6); 18 U.S.C. § 983; 18 U.S.C. § 984; and 28 U.S.C. §§ 1345, 1355, and 1395 because: (1) the United States of America commenced this civil in rem action; (2) any of the acts or omissions giving rise to this forfeiture occurred in this judicial district; (3) the forfeiture proceeding accrues in this judicial district; (4) the defendant was found in this judicial district; and (5) the above-named property (a) is now and, during the pendency of this action, will be in this judicial district, and (b) was found in this judicial district.

**IN REM JURISDICTION**

2. This Court will have in rem jurisdiction over the defendant if this Court signs an Order for Summons and Warrant of Arrest in Rem for the Property and the Clerk of the

Court issues a Summons and Warrant of Arrest in Rem for the Property, which will be executed upon the defendant and returned to the Court.

## VENUE

3. This Court has venue of this matter under 28 U.S.C. § 1395, Fed. R. Civ. P. Supp. Rule C(2)(c) and G(1) because: (1) the forfeiture proceeding accrues in this judicial district; (2) the defendant was found in this judicial district; and (3) the above-named property (a) is now and, during the pendency of this action, will be in this judicial district; (b) was found in this judicial district; and (c) was brought into this judicial district.

## PARTICULAR DESCRIPTION

4. The defendant is more particularly described as $163,500 in United States Currency.

## PLACE OF SEIZURE

5. On January 24, 2023, the Drug Enforcement Administration seized the currency from a vehicle being occupied by Kite Issac Finds the Feather and Deandre Tyron Dantzler on U.S. Interstate 80 located in Washoe County, Nevada.

## CUSTODY OF ASSET

6. On January 24, 2023, the defendant was transported to the DEA Reno Resident Office. On January 27, 2023, the defendant was deposited in the United States Marshals' Seized Asset Deposit Fund Account and has remained in the care, custody, and control of the United States Marshals Service since that time.

## TIMELY FILING

7. The Complaint is timely filed.

## VALUE

8. The defendant's value is $163,500 in United States Currency.

## FORFEITURE STATUTES

9. Because of the information below, the defendant is subject to forfeiture to the United States of America under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

/ / /

# FACTS

10. On January 24, 2023, Kite Issac Finds the Feather and Deandre Tyron Dantzler were driving westbound on U.S. Interstate 80 east of the Boomtown exit in Reno.

11. A Washoe County Sheriff's Office officer, Sgt. Nemeth, who was also traveling westbound in his patrol vehicle, noticed a vehicle traveling in front of him that had heavy road grime on the rear of the vehicle, causing its license plate to be illegible. The vehicle was a gray Chrysler Voyager van.

12. Sgt. Nemeth initiated a traffic stop near U.S. Interstate 80-mile marker four for an obstructed license plate in violation of NRS § 482.275, which states that "[e]very license plate must at all times be […] in a place and position to be clearly visible, and must be maintained free from foreign materials and in a condition to be clearly legible."

13. Sgt. Nemeth noted that in his training and experience some people involved in illegal activity may try to obstruct their license plate through various means.

14. Sgt. Nemeth exited his patrol vehicle, and when he was approximately 15 feet from the rear of the vehicle, he saw it was bearing Colorado license plate 878XBI.

15. Upon approaching the vehicle, Sgt. Nemeth noticed there were multiple suitcases, bags, and a yellow box in the rear of the vehicle.

16. Sgt. Nemeth also noticed that there was road grime or dirt all over the exterior of the vehicle that, according to Sgt. Nemeth's training and experience, was indicative of lengthy highway travel. Sgt. Nemeth similarly noticed there was a white substance all over the vehicle which, based on his training and experience, Sgt. Nemeth believed was sodium chloride, a substance used in the Midwest to assist with de-icing the highways for safer vehicle travel.

17. The driver verbally identified himself as Kite Finds The Feather (Kite). He verbally provided Sgt. Nemeth with his California driver's license number, which he stated was B5969452. He said he did not have a license in his possession.

18. The front passenger (and the only other occupant in the vehicle) identified himself as Deandre Dantzler and provided his California driver's license to Sgt. Nemeth.

19. Kite stated the vehicle was a rental when Sgt. Nemeth asked for the vehicle information. He said his girlfriend rented it and he did not have the rental agreement. Based on Sgt. Nemeth's training and experience, he indicated that people involved in illegal activity may avoid providing their rental agreement for a vehicle because it can provide details related to the travel of the vehicle and the circumstances of how it was rented.

20. Sgt. Nemeth asked Kite to exit the vehicle and the officer showed him how the license plate was covered with debris. Kite responded that he cleaned it when he attempted to clean the rear window.

21. Sgt. Nemeth and Kite moved back towards the WCS officer's patrol car so the officer could complete a wants and warrants check and issue a warning citation.

22. While completing those tasks, Sgt. Nemeth continued his discussion with Kite. Kite said he was coming from the "Other side of Reno" and stated he did real estate. When asked where he did real estate, Kite stated "All over." He then stated in Las Vegas and California.

23. Kite said he was in Reno for, "uh, I'd say, probably over a week."

24. Sgt. Nemeth then asked Kite where he stayed while in Reno and he said, "My girlfriends house, uh his girlfriend's house," referring to Dantzler.

25. Sgt. Nemeth asked for a cover unit.

26. Sgt. Nemeth asked Kite where Dantzler's girlfriend lived, and Kite said "Downtown."

27. Sgt. Nemeth asked what they did while in Reno and Kite said real estate and auctions. He went on to say they did pre foreclosures as well. When Sgt. Nemeth asked where, Kite said, "All over."

28. Kite told Sgt. Nemeth that he did not have a real estate license in Nevada because he did auctions.

/ / /

/ / /

4

29. Kite told Sgt. Nemeth that he lived in Willits, California. Through his training and experience, Sgt. Nemeth knew there was an active illegal marijuana trade in Willits that involved bulk transfers.

30. WCS Deputy Grulli arrived on scene and took over the warning citation while Sgt. Nemeth continued to talk with Kite.

31. Kite stated Dantzler lived in Sacramento, California but worked for him. Kite stated Dantzler worked for him for "Years."

32. Kite explained they were looking for houses in Reno that had a "Notice of Default" and "Notice of Justice." He said they would drive around and knock on doors when they saw them and ask the homeowner why they were foreclosing on their house. He said he would then offer their services.

33. Kite then stated he goes to the counties he is in and gets a list of foreclosures. Sgt. Nemeth asked if he did that while he was in Reno and Kite said he did. Sgt. Nemeth asked what county in Reno, and Kite responded, "The one here in Reno."

34. Kite started listing counties in California and explained that his private real estate business covered "Basically" all the counties down to San Diego, California. Sgt. Nemeth interrupted him and asked again what county in Reno he did this work in. Kite responded that he did not go to the county and now stated he used an app called "Property Radar" on his phone to find out what homes were foreclosing.

35. Next, Sgt. Nemeth spoke with Dantzler. Dantzler stated they were coming from "All around." He then specified Washoe County. Dantzler told Sgt. Nemeth he was training. He said they would look for houses where the owner was behind on payments and that they get lists from the counties that provide that information. Sgt. Nemeth asked him if he got the list in Washoe, and Dantzler responded, "He did," referring to Kite.

36. At that point, while talking to Dantzler, Washoe County dispatch advised Sgt. Nemeth that Kite has a suspended or revoked driver's license out of California.

37. Sgt. Nemeth asked Dantzler how long they had been in Reno, and he said, "I don't know, maybe a day."

38. Sgt. Nemeth then asked Dantzler to exit the vehicle and asked to pat him down. Dantzler gave Sgt. Nemeth permission to do so. Sgt. Nemeth noticed Dantzler's wallet was in his front right pants pocket and that it looked "big/fat."

39. Sgt. Nemeth asked Dantzler if there was anything illegal in the vehicle and Dantzler responded that there was no meth, marijuana, cocaine, heroin, guns, or large amounts of money in the vehicle.

40. Sgt. Nemeth asked to search Dantzler's belongings in the vehicle. Dantzler said, "My stuff" and put his hands on his chest. Sgt. Nemeth and Dantzler were talking away from anyone in the immediate area. Sgt. Nemeth asked him again and he said, "My stuff" and said they had a lot of bags. He then said that Sgt. Nemeth could search.

41. Sgt. Nemeth also asked to see Dantzler's wallet because it was very big. Dantzler opened it and Sgt. Nemeth saw numerous bills of U.S. currency inside.

42. Sgt. Nemeth met back with Kite and asked him if there was anything illegal in the vehicle. He asked if there was meth, cocaine, heroin, or marijuana, and Kite said "no" to each individually, as asked by Sgt. Nemeth. When Sgt. Nemeth asked if there were any large amounts of money, Kite was delayed in his answer and then said, "No, I'm, I'm, I'm not gonna go." He then said there was nothing in the vehicle and he did not consent to a search, even though Sgt. Nemeth had not asked him to search.

43. During his contact with the occupants, Sgt. Nemeth noticed the following indicators of possible criminal activity through his training and experience:

    a. Dirty license plate;

    b. Highway grime/possible sodium chloride from Midwest not consistent with travel plans;

    c. No license or identification in possession for driver;

    d. Suspended or revoked license;

    e. Third-party rental;

    f. Oversized rental;

    g. Vagueness with stay in Reno for over a week;

      h.  Vague on employment;

      i.  Self-employed/owner of real estate company without a license;

      j.  Nervousness that did not subside;

      k.  Travel plans between occupants inconsistent with each other;

      l.  Avoiding questions when asked;

      m.  Appeared to be making up story as questions were asked; and

      n.  Delaying answers

44.  Sgt. Nemeth took back over the warning citation and asked Dep. Grulli to complete a free air sniff with his Police Service Dog, K9 Jett. Dep. Grulli completed the free air sniff with K9 Jett and K9 Jett gave a final alert to the odor of narcotics coming from the vehicle. K9 Jett is certified for narcotics detection.

45.  Nevada State Highway Patrol Trooper, Sergeant Brown (NHP Trooper Brown), then arrived on scene and stood by with Kite and Dantzler.

46.  Sgt. Nemeth paused the warning citation and explained to Kite and Dantzler that the positive alert from K9 Jett, along with other indicators observed, provided probable cause to search the vehicle. Sgt. Nemeth again asked about the list of drugs, guns, and large amounts of currency being in the vehicle with Kite and Dantzler. Kite said no to all.

47.  Sgt. Nemeth conducted a search of the vehicle. Sgt. Nemeth opened the side sliding door of the van and saw the yellow box was a heat-sealing machine from Cabela's. Sgt. Nemeth also observed another box underneath the heat-sealing machine box containing multiple rolls of unused heat-sealing bags. Through Sgt. Nemeth's training and experience, heat sealing machines and bags are commonly used to package bulk marijuana on the black market.

48.  Sgt. Nemeth located a large suitcase inside the right side of the sliding door area. He took the suitcase out of the van to put on the ground to search it and saw it had a locked TSA-style lock on the main compartment of the bag. He asked Kite for the combination, but Kite refused to give it to Sgt. Nemeth. Sgt. Nemeth then utilized his handcuff key to

/ / /

7

open the suitcase by sticking it between the teeth of the zipper, which in-turn, opened the bag without damaging it.

49. Sgt. Nemeth found a white and red plastic commercial store type bag containing bulk currency inside the suitcase. The currency was packaged in bundles which looked like similar amounts. The bundles were separated by rubber bands. Through Sgt. Nemeth's training and experience, the packaging of the currency was consistent with drug-trafficking methods.

50. Sgt. Nemeth then contacted the DEA and Agent Ruiz stated he would respond for a joint investigation.

51. Sgt. Nemeth requested a criminal history and dispatch advised that Kite had a lengthy criminal history, which includes possession and distribution of marijuana.

52. Dispatch also advised that a criminal history search on Dantzler showed he also has a lengthy history of drug-related charges, including possession and selling of multiple types of drugs.

53. Sgt. Nemeth met back with Kite, who now stated he had that money because of doing real estate auctions. Kite asserted that it was his money and he did not tell Sgt. Nemeth about it when asked because he did not know the laws in each state. He claimed it was not illegal to have that much money.

54. Sgt. Nemeth asked Kite if he was a licensed money courier and Kite responded that he was not. Kite claimed it was his money again and he used it to pay cash at house auctions on the courthouse steps. Kite stated that he utilized banks, but the auctions needed cash.

55. Kite claimed the total amount of the currency was $160,000.

56. Sgt. Nemeth met back with Dantzler, who stated he did not have any large amounts of money. He also stated he did not know Kite had the bulk currency in the vehicle.

57. Inside the vehicle, a black jacket that belonged to Dantzler contained bulk currency in each side pocket that Dantzler claimed was $6,000.

58. Sgt. Nemeth and other officers continued the search after notifying the DEA. Inside the above-mentioned suitcase was a black computer bag that was locked as well. It was opened without damage and contained two computers along with a maroon bag containing an unknown amount of bundled cash. There were also multiple thumb drives in the computer case.

59. During the search, the officers also found a wallet belonging to Kite that contained approximately $200 in cash.

60. Through Sgt. Nemeth's training and experience, it is common for illegal drug trafficking couriers to have a small amount of spending money in their wallet (e.g., the $200), a payment for transportation of the currency (e.g., the maroon bag), and the overall bulk currency that they are transporting (e.g., the $160,000 in the shopping bag).

61. Agent Ruiz completed a bulk currency questionnaire with Kite.

62. During Agent Ruiz's conversation with Kite, Kite informed the Agent that he was in Reno looking for real estate. Agent Ruiz asked him what properties he was looking at and Kite was unable to provide any specific information related to properties he was looking at.

63. Kite told Agent Ruiz that he had withdrawn the $160,000 from his business bank account back in May 2020 (i.e., over two-and-a-half years prior to the traffic stop).

64. Agent Ruiz asked Kite if he always carried large amounts of cash and Kite replied "yes."

65. Kite indicated to Agent Ruiz that his realtor business was his sole source of income.

66. A short time later, Homeland Security Investigations Agent Lux arrived on scene and met with Dantzler. Agent Lux completed a bulk currency questionnaire with Dantzler.

67. During Agent Lux's conversation with Dantzler, Dantzler indicated he was learning real estate from Kite, and they had been in Reno for 3-4 days.

/ / /

68. Dantzler told Agent Lux that they "stayed with a friend" while in the Reno area but did not offer the name of the friend to the Agent.

69. Dantzler indicated to Agent Lux that, at the time, he worked as a hibachi chef and had an annual salary of approximately $40,000. He does not have a bank account and cashes his paychecks.

70. NHP Troopers Perthel and Tumanuvao then arrived on scene. Dep. Grulli took the bulk currency in the shopping bag and moved it to the side of the highway for an open area search. The search area contained bushes, trash, and other debris.

71. NHP Trooper Perthel completed a search with his Police Service Dog, K9 Duke. K9 Duke located the bulk currency in the open search area and gave an alert to the odor of narcotics coming from the currency. K9 Duke is certified for narcotics detection.

72. WCS Lt. Zirkle arrived on scene and contacted Enterprise Rental. It was found during that contact that Alicia Kepple rented the vehicle on January 5, 2023, in Ukiah, California with 58,462 miles on the vehicle. When Sgt. Nemeth stopped the vehicle, it had 66,441 miles on the vehicle, which indicated that 7,979 miles were put on the vehicle during the rental period of 19 days. It was also found that the return date for the rental was January 25, 2023, in Ukiah.

73. Upon completion of the questionnaires by both agents, it was decided by them to seize the currency pending federal forfeiture proceedings.

74. Agent Ruiz and Agent Lux packaged the currency in multiple sealed bags. In one bag was the bulk currency and the currency that was in the maroon bag, all of which Kite claimed. There were also two laptop computers, three cellphones, and four miscellaneous thumb drives seized. In another bag was the currency that was in Dantzler's jacket. All items were packaged in front of Kite and Dantzler and they were provided a receipt for all items seized by the DEA.

75. On January 25, 2023, when Agent Ruiz and Agent Lux brought the currency to Loomis for official counting, the Loomis employee commented to the agents about the strong smell of marijuana coming from the currency.

76. The breakdown of the currency was as follows:

    a. $100 x 524 = $52,400

    b. $50 x 179 = $8,950

    c. $20 x 5,013 = $100,260

    d. $10 x 156 = $1,560

    e. $5 x 66 = $330

### FIRST CAUSE OF ACTION

77. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 76 as though fully set forth herein.

78. The defendant is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., and is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

### SECOND CAUSE OF ACTION

79. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 76 as though fully set forth herein.

80. The defendant is all proceeds traceable to all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

### THIRD CAUSE OF ACTION

81. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 76 as though fully set forth herein.

82. The defendant is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

## FOURTH CAUSE OF ACTION

83. The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 76 as though fully set forth herein.

84. The defendant is any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," here Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., (incorporated through 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D)), or a conspiracy to commit such offense and is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## CONCLUSION

85. Because of the foregoing, the defendant is subject to forfeiture and has become and is forfeited to the United States of America, plaintiff, under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America, Plaintiff, prays as follows:

1. Due process issue to enforce the forfeiture of the defendant;

2. Due notice be given to any interested party to appear and to show cause why the forfeiture should not be decreed;

3. The defendant be condemned and be forfeited to the United States; and

4. This Court enter other and further relief as it deems just and proper.

Dated: August 29, 2023.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

/s/Misty L. Dante
MISTY L. DANTE
Assistant United States Attorney

**VERIFICATION**

I, Diego Ruiz, am a Special Agent with the Drug Enforcement Administration. I have read the contents of the foregoing complaint, and under 28 U.S.C. § 1746(2), I declare and verify under penalty of perjury that the foregoing is true and correct.

Executed this August __, 2023.

_____
DIEGO RUIZ
Special Agent
Drug Enforcement Administration